UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| SOON O. KIM, an individual, | Case No. 3:12-cv-00430-MMD-WGC |
| Plaintiff, | ORDER |
| v. | (Defs.' Motion for Summary Judgment – dkt. no. 36) |
| HUMBOLDT COUNTY HOSPITAL DISTRICT, dba HUMBOLDT GENERAL HOSPITAL; MOE HANZLIK, MARY ORR, MEL HUMMEL, JIM FRENCH, and JIM PARRISH, individuals, | |
| Defendants. | |

## I.   SUMMARY

Before the Court is a Motion for Summary Judgment ("Motion") filed by Defendants Humboldt County Hospital District, dba Humboldt General Hospital ("HGH"); and Moe Hanzlik, Mary Orr, Mel Hummel, Jim French, and Jim Parrish (collectively, "Individual Defendants") (dkt. no. 36). The Court has reviewed Plaintiff Soon O. Kim's opposition (dkt. no. 42) and Defendants' reply (dkt. no. 45). For the reasons discussed below, the Motion is denied in part.

## II.   BACKGROUND

Plaintiff asserts that HGH, her former employer, violated her First Amendment rights in terminating her employment in April 2012. The following facts are undisputed. (*See* dkt. no. 36 at 3; dkt. no. 42 at 1.)

Plaintiff began working for HGH as a general surgeon in November 2003. (Dkt. no. 36 at 3.) In September 2010, Plaintiff entered into an Agreement for Physician Employment ("Agreement" or "Employment Agreement") to renew her employment with HGH for a three-year term. (Dkt. no. 36-2, Exh. 1.) Under the Agreement, Plaintiff would provide general surgery services to HGH between January 1, 2011, and December 31, 2013. (*Id.*, Exh. 1, at 2.) Either Plaintiff or HGH could terminate the Agreement without cause with written notice of 180 days. (*Id.*, Exh. 1, at 12.) The Agreement states that HGH's Administrator, Defendant Parrish, would supervise "all non-clinical aspects" of Plaintiff's employment. (*Id.* Exh. 1, at 7-8; *see id*, Exh. 2, at 22.)

When Plaintiff signed the Agreement, she was also a member of HGH's Board of Trustees ("Board"). (*See id.*, Exh. 2, at 33-34.) Plaintiff had been elected to the Board in November 2008, and began her four-year term in January 2009. (*Id.*, Exh. 2, at 34.) She filed for reelection on March 16, 2012; elections were to occur in November 2012. (*Id.*, Exh. 2, at 27-28.) Plaintiff, however, left the hospital in August 2012, a few months after the Board voted to terminate her Agreement. (*Id.*, Exh. 2, at 18). Plaintiff also served as HGH's chief of staff from October 2011 until she left the hospital. (*Id.*, Exh. 2, at 18.)

In January 2012, the Board amended its corporate compliance policy to address potential conflicts of interest created when HGH employees serve on its Board. (Dkt. no. 3 ¶¶ 3, 7; *see* dkt. no. 36-4, Exh. 7, at 11.) The amended policy included a Political Participation provision that states: "a Hospital employee shall not engage in any employment, activity or enterprise, including service on the Hospital Board, which is inconsistent, incompatible or in conflict with their duties as an employee." (Dkt. no. 36-4, Exh. 7, at 11.) The policy further provides that if an employee's Board membership creates a conflict of interest, the employee may resign from his or her position "prior to taking and executing the oath of office and beginning the term of office," or take paid or unpaid leave. (*Id.*, Exh. 7, at 11.) Plaintiff abstained from voting on this provision during the Board's January 2012 meeting. (Dkt. no. 36 at 6; *see* dkt. no. 36-2, Exh. 2, at 20.) ///

1  Two months later, in March 2012, Plaintiff filed her candidacy for reelection to the Board.

2  (Dkt. no. 36-2, Exh. 2, at 27-28.)

3       In April 2012, the Board unanimously voted to terminate Plaintiff's Employment

4  Agreement.[1] (Dkt. no. 36-4, Exh. 8, at 22.) Defendants Hanzlik, Orr, Hummel, and

5  French participated in the vote; Plaintiff abstained. (*Id.*, Exh. 8, at 22.) The vote occurred

6  after a presentation by Parrish, HGH's Administrator, and a Board discussion on the

7  drawbacks of having a single surgeon at HGH, the need for additional surgeons at the

8  hospital, and the potential benefits of hiring a surgical service for HGH. (*Id.*, Exh. 8, at

9  22.) Parrish had been researching surgical services for approximately one year before

10  the presentation. (Dkt. no. 36-2, Exh. 2, at 26.) A vote on the surgical service occurred in

11  May 2012. (*Id.*, Exh. 2, at 26.)

12       Beginning in 2004, before the Employment Agreement was terminated, Plaintiff

13  and other physicians at HGH brought complaints to HGH's Administrator and Board. (*Id.*,

14  Exh. 2, at 35, 37.) Plaintiff testified that the complaints were designed to help improve

15  the hospital's internal operations. (*Id.*, Exh. 2, at 36-37.) A Medical Staff Issues

16  spreadsheet was generated[2] in 2007 to record and monitor the status of these

17  complaints. (*Id.*, Exh. 2, at 35.) In the three months before her Employment Agreement

18  was terminated, Plaintiff's complaints identified nursing training and personnel needs,

19  patient education needs, slowness in lab results, and issues with the operating room.

20  (Dkt. no. 36-3, Exh. 3, at 13-14.) The spreadsheet was occasionally presented to the

21  Board, although it is not clear whether or when the Board reviewed the document. (Dkt.

22  no. 36-2, Exh. 2 at 37.)

23  ///

---

24       [1]Specifically, French moved to terminate the Agreement, which Orr seconded.
25  (Dkt. no. 36-4, Exh. 8, at 22.) Hanzlik, Orr, French, and Hummel — every Board member
    present at the April 2012 meeting, except for Plaintiff — voted for termination. (*Id.*, Exh.
26  8, at 20, 22.)

27       [2]Defendants contend that HGH's physicians maintained the spreadsheet. (Dkt.
    no. 36 at 4 (citing Plaintiff's Deposition, dkt. no. 36-2, Exh. 2, at 35).) In her deposition,
28  however, Plaintiff testified that the Administrator generated the spreadsheet. (Dkt. no.
    36-2, Exh. 2, at 35.)

1   Plaintiff initiated this action against HGH, its Administrator, and several of its

2   Board members in August 2012, alleging that the termination of her Employment

3   Agreement violated her First Amendment rights.[3] (Dkt. no. 1.) Plaintiff sues the

4   Administrator and the Board members in their individual capacities. (Dkt. no. 3 ¶ 3.)

5   Defendants move for summary judgment, arguing that Plaintiff's claims must fail as a

6   matter of law because Plaintiff cannot show that Defendants deprived her of her rights

7   under the First Amendment, because Plaintiff cannot establish municipal liability for HGH

8   or individual liability for Individual Defendants, and because Individual Defendants are

9   entitled to qualified immunity. (Dkt. no. 36 at 2-3.)

10  ### III.    LEGAL STANDARD

11  The purpose of summary judgment is to avoid unnecessary trials when there is no

12  dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

13  F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when "the movant

14  shows that there is no genuine dispute as to any material fact and the movant is entitled

15  to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477

16  U.S. 317, 322-23 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on

17  which a reasonable fact-finder could find for the nonmoving party and a dispute is

18  "material" if it could affect the outcome of the suit under the governing law. *Anderson v.*

19  *Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ

20  on the material facts at issue, however, summary judgment is not appropriate. *Nw.*

21  *Motorcycle Ass'n*, 18 F.3d at 1472. "The amount of evidence necessary to raise a

22  genuine issue of material fact is enough 'to require a jury or judge to resolve the parties'

23  differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th

24  Cir. 1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89

25  (1968)). In evaluating a summary judgment motion, a court views all facts and draws all

26  ///

27  [3]In September 2012, Plaintiff filed a First Amended Complaint ("FAC"), adding an
equal protection claim that the parties have since agreed to dismiss. (Dkt. no. 3; *see* dkt.

28  nos. 34, 35.)

inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (citation and internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

Plaintiff alleges that the termination of her Employment Agreement violated her First Amendment rights because it was motivated by two forms of retaliation: first, Defendants retaliated against Plaintiff's decision to seek reelection to the Board; and second, Defendants retaliated against complaints Plaintiff had made about HGH's operations. (Dkt. no. 3 ¶¶ 9-11.) With regard to Plaintiff's first claim, the parties dispute whether Defendants' Political Participation provision is unconstitutional both facially and as applied to Plaintiff's decision to seek reelection, and whether Plaintiff's Employment Agreement was terminated in retaliation for that decision. (*See* dkt. no. 3 ¶¶ 7-9, 11-12; dkt. no. 36 at 9-13; dkt. no. 42 at 3-4, 6; dkt. no. 45 at 9-13.) The Court finds that

1   supplemental briefing and a hearing on these issues are necessary. The Court therefore

2   reserves judgment on Plaintiff's claim that Defendants violated her First Amendment

3   rights by restricting her ability to seek reelection.

4       This Order focuses on Plaintiff's second claim — whether Plaintiff's complaints

5   about HGH motivated Defendants to terminate her Employment Agreement in violation

6   of her First Amendment rights. Defendants contend that Plaintiff's second claim must fail

7   because she cannot demonstrate a deprivation of her First Amendment rights pursuant

8   to a five-factor test that applies to First Amendment retaliation claims.[4] (Dkt. no. 36 at

9   13); *see Eng v. Cooley*, 552 F.3d 1062, 1070-72 (9th Cir. 2009) (describing the five

10  factors). Rather, Defendants assert, the Employment Contract was terminated due to a

11  business decision, not because of Plaintiff's speech on matters of public concern.[5] (Dkt.

12  no. 36 at 13-19.) The Court finds that a genuine issue of material fact exists as to

13  whether the termination of Plaintiff's Employment Agreement violated her First

14  Amendment right to speak on matters of public concern.

15      Plaintiff brings her claims under 42 U.S.C. § 1983, which provides for the private

16  enforcement of substantive rights conferred by the Constitution and federal statutes.

17  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Section 1983 establishes liability for

18  any person who, acting under the color of law, deprives a citizen of a right, privilege or

19  immunity protected by the Constitution or federal law. 42 U.S.C. § 1983. Plaintiff asserts

20  that HGH and Individual Defendants deprived her of substantive rights conferred by the

21  First Amendment. As a municipal entity, however, HGH "may not be held liable under 42

22  ///

23

24  [4]Neither party asserts that Plaintiff's first claim regarding her reelection should be reviewed under this 5-factor test for speech involving matters of public concern. (*See* dkt. no. 36 at 13-19; dkt. no. 42 at 3-8; dkt. no. 45 at 13-17.) Plaintiff, however, groups the factors into two general arguments: (1) protected activity, and (2) retaliatory motive. (*See* dkt. no. 42 at 3-8.) Within those groups, Plaintiff addresses the five factors in the context of her second claim, not her first. (*See id.* at 4-5, 7-8.)

25

26

27  [5]Defendants also assert that Plaintiff failed to offer any properly authenticated and otherwise admissible evidence to support her opposition to the Motion. (Dkt. no. 45 at 4-8.) The Court need not address this argument because Defendants' own evidence suggests that a genuine dispute of material fact exists.

28

U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978)). The Court will address liability for Individual Defendants and for HGH separately.

### A.    Individual Defendants

Defendants contend that Plaintiff's § 1983 claim against Individual Defendants must fail for three reasons: first, Plaintiff cannot demonstrate that the Employment Agreement's termination deprived her of her First Amendment right to speak on a matter of public concern; second, Individual Defendants did not engage in any activity that caused the alleged violation of Plaintiff's First Amendment rights; and third, Individual Defendants are entitled to qualified immunity. (Dkt. no. 36 at 13-19, 20-23; dkt. no. 45 at 13-18.) The Court considers each argument in turn.

### 1.    Deprivation of Plaintiff's First Amendment Right to Speak on a Matter of Public Concern

A First Amendment retaliation claim against a government employer involves a series of five questions:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Desrochers v. City of San Bernardino*, 572 F.3d 703, 708-09 (9th Cir. 2009) (quoting *Eng*, 552 F.3d at 1070). All five factors are necessary — "failure to meet any one of them is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc), *cert. denied sub nom. City of Burbank v. Dahlia*, 134 S. Ct. 1283 (2014). A plaintiff must satisfy the first three steps of the five-step test. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013) (citing *Robinson v. York*, 566 F.3d

///

817, 822 (9th Cir. 2009)). If the plaintiff succeeds, then the burden shifts to the government to establish the fourth and fifth steps. *Id.* (citing *Robinson*, 566 F.3d at 822).

### a. Matter of Public Concern

In analyzing the first step of the inquiry, public concern, "the essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest." *Desrochers*, 572 F.3d at 709 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). The plaintiff "bears the burden of showing that the speech addressed an issue of public concern." *Eng*, 552 F.3d at 1070 (citing *Connick*, 461 U.S. 138; *Bauer v. Sampson*, 261 F.3d 775, 784 (9th Cir. 2001)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Eng*, 552 F.3d at 1070 (quoting *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995)) (internal quotation marks omitted).

The content of the speech is "the greatest single factor in the *Connick* inquiry." *Desrochers*, 572 F.3d at 710 (citations and internal quotation marks omitted). To address a matter of public concern, the content of the speech must involve "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Id.* (citations and internal quotation marks omitted). "On the other hand, speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (citation and internal quotation marks omitted); *see also Connick*, 461 U.S. at 154 (speech limited to "an employee grievance concerning internal office policy" is unprotected). Speech that is not of public concern also includes "speech that relates to internal power struggles within the workplace, and speech that is of no interest beyond the employee's bureaucratic niche." *Desrochers*, 572 F.3d at 710 (quoting *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996)) (footnote and internal quotation marks omitted).

///

Plaintiff argues that her complaints about the quality of HGH's internal operations — which appear primarily in the Medical Staff Issues spreadsheet — involve matters of public concern. (Dkt. no. 42 at 4-5; *see* dkt. no. 3 ¶ 10.) The Medical Staff Issues spreadsheet includes physician complaints submitted between November 2007 and July 2012, many of which came from Plaintiff. (Dkt. no. 36-3, Exh. 3.) For example, in the three months before her Employment Agreement was terminated, Plaintiff pointed out problems with "[p]atient WiFi access"; operating room policies; "[d]efib training for nurses"; "[t]ouch[] screen education for patients"; and the timeliness of certain hospital functions, including FFP delivery and daily lab results. (*Id.*, Exh. 3, at 13-14.) Plaintiff also co-authored complaints with other HGH physicians, including that "[a]ntibody identification [was] slow," and that there was "OR tech frustration on resection." (*Id.*, Exh. 3, at 13-14.)

Defendants contend that these complaints fail to qualify as matters of public concern because they are "simple reference[s] to government functioning." (Dkt. no. 45 at 14 (quoting *Brownfield v. City of Yakima*, 612 F.3d 1140, 1148 (9th Cir. 2010)).) In *Brownfield*, the Ninth Circuit rejected a police officer's First Amendment retaliation claim because the content of his speech "was decidedly personal." 612 F.3d at 1147, 1149. The officer prepared a memo, notes, and other documents chronicling perceived deficiencies about his partner and supervisor. *Id.* at 1142-44. He also met and communicated with superior officers about his partner. *Id.* Although one could read these complaints as speaking to the police department's functioning, the court emphasized that such references "do[] not automatically qualify as speech on a matter of public concern." *Id.* at 1148 (alteration, citation, and internal quotation marks omitted). Rather, the court concluded, the plaintiff's speech was "the stuff of internal power struggles within the workplace," and not of concern to the public. *Id.* (quoting *Desrochers*, 572 F.3d at 710) (internal quotation marks omitted).

Here, in contrast, Plaintiff's complaints reflect broader concerns about HGH's operations, including, for example, the timeliness of hospital services, the facilities and

educational opportunities offered to patients, and nurse training needs. (*See* dkt. no. 36-3, Exh. 3, at 13-14.) Plaintiff's complaints illustrate "department-wide problems, not private grievances." *Ellins*, 710 F.3d at 1058 (concluding that a police officer engaged in speech of public concern by leading a union's no-confidence vote for a police chief). Far from an internal personnel dispute, these complaints speak to HGH's provision of patient care, an issue that "the public or community is likely to be truly interested in." *Brownfield*, 612 F.3d at 1148 (citation and internal quotation marks omitted). The content of Plaintiff's complaints thus indicates that Plaintiff engaged in speech of public concern.

Defendants also assert that the context and form of Plaintiff's complaints should weigh against finding that her speech involves matters of public concern. Defendants emphasize that the Medical Staff Issues spreadsheet was presented only to the Board, and not to any public outlet. (Dkt. no. 36 at 15; dkt. no. 45 at 14-15.) "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made . . . to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Desrochers*, 572 F.3d at 710 (quoting *Johnson*, 48 F.3d at 425) (internal quotation marks omitted). This is not a close case. Plaintiff's complaints involve matters of public concern, including patient care at HGH. This content is not outweighed by the fact that the Medical Staff Issues spreadsheet was an internal document. *See Demers v. Austin*, 746 F.3d 402, 416 (9th Cir. 2014) ("[L]imited circulation is not, in itself, determinative."). Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court finds that a genuine issue of material fact exists as to Plaintiff's engagement in speech on a matter of public concern.

### b.    Public Employee or Private Citizen

The Court must next determine whether a fact-finder could conclude that Plaintiff was acting as a private citizen — rather than as public employee — when she complained about HGH's operations. *See Eng*, 552 F.3d at 1071. "[C]ourts must make a 'practical' inquiry when determining the scope of a government employee's professional

duties." *Dahlia*, 735 F.3d at 1063. Although this factor is a mixed question of fact and law, *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 749 (9th Cir. 2010), determining whether a plaintiff acts as a public employee or a private citizen involves a fact-intensive inquiry. *Dahlia*, 735 F.3d at 1074. As the Supreme Court has noted:

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006), *quoted in Dahlia*, 735 F.3d at 1069.

Although "no single formulation of factors can encompass the full set of inquiries" involved in this determination, the Ninth Circuit has established "a few guiding principles" for this analysis. *Dahlia*, 735 F.3d at 1074. First, in a "highly hierarchical employment setting . . . whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor." *Id.* Communications outside a chain of command generally suggest that an employee is not acting according to her official duties. *Id.* (citing *Frietag v. Ayers*, 468 F.3d 528, 545-46 (9th Cir. 2006)). Second, courts may consider the subject matter of the communication. A "routine report, [prepared] pursuant to a normal departmental procedure, about a particular incident or occurrence" may indicate that an employee is acting within her duties. *Id.* at 1075 (citing *Garcetti*, 547 U.S. at 421). Speech that raises "broad concerns about corruption or systemic abuse," however, may fall outside an employee's job duties. *Id.* Finally, speech "in direct contravention to [an employee's] supervisor's orders" may support a finding that an employee's speech is outside of her official duties. *Id.*

Defendants argue that Plaintiff was acting within her official duties when she lodged the complaints about HGH's operations and facilities that appear in the Medical Staff Issues spreadsheet. (Dkt. no. 36 at 16; dkt. no. 45 at 15-16.) To support this argument, Defendants point to Plaintiff's deposition testimony, in which Plaintiff agreed that she raised these complaints "for the purpose of improving [her] work environment as and [sic] employee/physician of HGH." (Dkt. no. 36-2, Exh. 2, at 40; *see* dkt. no. 36 at

16; dkt. no. 45 at 15-16.) Defendants further stress that Plaintiff admitted to making those complaints "in [her] capacity as a contract employee/physician of HGH." (Dkt. no. 36-2, Exh. 2, at 40; *see* dkt. no. 36 at 16.) The Court is not persuaded by this testimony. First, neither admission indicates that Plaintiff was speaking to the legal distinction between a public employee and a private citizen in admitting that she made these complaints while she was employed by HGH. Indeed, "[s]tatements do not lose First Amendment protection simply because they concern the subject matter of the plaintiff's employment." *Anthoine*, 605 F.3d at 749 (alteration, citation, and internal quotation marks omitted). Moreover, Plaintiff's testimony indicates that Plaintiff and other staff instituted the complaint process themselves — Plaintiff stated that she was "the reservoir of all the complaints," and that the Medical Staff Issues spreadsheet was generated in response to her initiative in seeking to resolve those complaints. (Dkt. no. 36-2, Exh. 2, at 35.) This testimony suggests that Plaintiff's complaints were offered outside the context of her official duties as HGH's surgeon.

Defendants also highlight Plaintiff's Employment Agreement, which lists the following provision as one of several Physician Duties:

> Physician [Plaintiff] shall promptly advise Hospital [HGH] of any deficiency or dangerous condition known to Physician in any part of the facilities, equipment or supplies provided by Hospital or any Physician perceived deficiency, training need or performance problem of any personnel supplied by Hospital.

(Dkt. no. 36-2, Exh. 1, at 3; *see* dkt. no. 45 at 15.) Defendants contend that this provision would "certainly" require Plaintiff to report "such issues as 'Patient WiFi access,' 'O.R. time out policy' and 'Daily labs not happening on a daily basis.'" (Dkt. no. 45 at 15.) Like a job description, however, this provision is "neither necessary nor sufficient" to define the scope of Plaintiff's official duties. *Garcetti*, 547 U.S. at 424-25. Nor have Defendants offered evidence demonstrating what "chain of command" would actually apply to Plaintiff's complaints, had they been part of her official duties. *See Dahlia*, 735 F.3d at 1074. Furthermore, the evidence does not make clear whether the Medical Staff Issues spreadsheet — or other complaints that, according to Plaintiff's testimony, were raised

but never included in the spreadsheet[6] — is a routine report that Plaintiff contributed to as part of her duties. *See id.* at 1075. Thus, reading the evidence in the light most favorable to Plaintiff, the Court finds that a genuine issue of material fact exists as to whether Plaintiff spoke as a private citizen or a public employee.

### c.     Substantial   or   Motivating   Factor   Behind   Plaintiff's Termination

Determining whether Plaintiff's speech was a "substantial or motivating factor in the adverse employment action" is a factual inquiry. *Eng*, 552 F.3d at 1071 (citation and internal quotation marks omitted). "[A]n adverse employment action is an act that is reasonably likely to deter employees from engaging in constitutionally protected speech." *Coszalter*, 320 F.3d at 970. A plaintiff may establish that retaliation was a substantial or motivating factor behind an adverse employment action with evidence that:

> (1) the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) the employer expressed opposition to the speech, either to the speaker or to others; or (3) the proffered explanations for the adverse action were false and pretextual.

*Ellins*, 710 F.3d at 1062 (citing *Coszalter*, 320 F.3d at 977). Evidence of only one of these factors "may be sufficient to allow a plaintiff to prevail in a public employee retaliatory speech claim." *Id.* at 1063 (citing *Marable v. Nitchman*, 511 F.3d 924, 930 (9th Cir. 2007)).

Defendants argue that Plaintiff has not offered — and cannot offer — any evidence of these factors. First, Defendants contend that the timing of Plaintiff's termination is too remote to suggest that retaliation was a substantial or motivating factor. (Dkt. no. 36 at 17.) Defendants point out that Plaintiff submitted complaints beginning in 2007, and received raises and promotions until her Employment Agreement

///

---

[6]Plaintiff testified that several complaints were not listed in the Medical Staff Issues spreadsheet. (Dkt. no. 36-2, Exh. 2, at 35.) For example, Plaintiff testified that she complained that physicians were being pressured to overuse HGH's ambulance services to help generate funds for the hospital. (*Id.*, Exh. 2, at 35.)

was terminated in 2012. (*Id.*) Next, highlighting Plaintiff's deposition testimony, Defendants argue that Plaintiff undermined her retaliation argument by admitting that the Board rarely, if ever, reviewed the Medical Staff Issues spreadsheet. (*Id.* at 17-18 (citing dkt. no. 36-2, Exh. 2, at 37).) Defendants further insist that Plaintiff contradicted her retaliation claim by testifying that she was terminated because of her decision to seek reelection. (*Id.* at 18 (citing dkt. no. 36-2, Exh. 2, at 25).) Finally, Defendants take issue with the admissibility of evidence Plaintiff offered in response to their Motion, which, according to Plaintiff, indicates that Defendants expressed opposition to Plaintiff's complaints. (Dkt. no. 45 at 16-17 (arguing that the evidence is inadmissible hearsay).) Even in light of these arguments, the Court finds that an issue of fact exists as to the motivation behind Plaintiff's termination.

As an initial matter, there is no dispute that the termination of Plaintiff's Employment Agreement constitutes an adverse employment action. (*See* dkt. no. 36 at 16-18; dkt. no. 42 at 6-8; dkt. no. 45 at 16-17); *see Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2001) (as amended) ("And, of course, termination of employment is an adverse employment action . . . ."); *see also Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 977 (9th Cir. 2002) (noting that a plaintiff need only demonstrate that she "suffered a loss of any governmental benefit or privilege in retaliation for protected speech activity, not that [s]he had a legal right to the benefit denied [her]" (citation and internal quotation marks omitted)).

With regard to the substantial or motivating factor, Defendants' evidence suggests that the decision to terminate the Employment Agreement was false and pretextual. In *Coszalter*, the Ninth Circuit concluded that, in addition to close timing between the plaintiff's protected speech and the defendants' adverse employment action, the plaintiff had offered evidence of pretext by demonstrating that the defendants had inconsistently applied the policy for which the plaintiff was allegedly terminated. *Coszalter*, 320 F.3d at 978. In *Anthoine*, the court likewise reasoned that the plaintiff had offered evidence of a false and pretextual employment action by showing that his employer dismissed him for

1    poor performance despite many examples of similarly unsatisfactory performance in the

2    years before his termination. *Anthoine*, 605 F.3d at 751-52. The plaintiff's disciplinary

3    problems became grounds for his termination only after he engaged in protected

4    speech. *Id.*

5         Here, Plaintiff's Employment Agreement was purportedly terminated because the

6    Board decided to contract with a third party to provide more surgical services at HGH.

7    (*See* dkt. no. 36-4, Exh. 8, at 22.) Minutes from the April 24, 2012, Board meeting

8    indicate that Parrish presented his research on "alternatives for providing surgery

9    services to the Humboldt County area."[7] (*Id.*, Exh. 8, at 22.) Parrish argued that HGH

10   was reaching only 30% of the area's market for surgeries. (*Id.*, Exh. 8, at 22.) Board

11   members noted a high demand for surgical services in the area, and one member

12   expressed concerns about employing only one surgeon — Plaintiff — at HGH, including

13   HGH's vulnerability if anything should happen to Plaintiff, and potential liability caused by

14   the Plaintiff's practice of working long shifts. (*Id.*, Exh. 8, at 22.) The Board then voted to

15   notify Plaintiff that her Employment Agreement would be terminated at the close of a

16   180-day notice period mandated by the Employment Agreement. (*Id.*, Exh. 8, at 22.) The

17   Board simultaneously voted to "pursue recruitment of additional surgical coverage for

18   consideration at the next board meeting." (*Id.*, Exh. 8, at 22.)

19        These simultaneous decisions suggest pretext. Although Plaintiff testified that

20   Parrish had started researching outside surgical services in 2011 (dkt. no. 36-2, Exh. 2,

21   at 26), the April 24, 2012, minutes indicate that the Board decided to dismiss Plaintiff

22   before securing — or even recruiting — an alternative provider of surgical services (dkt.

23   no. 36-4, Exh. 8, at 22). Aside from Parrish's research on outside surgical services, the

24   evidence suggests that Defendants took no action to redress their concerns about

25

26        [7]The minutes merely summarize the Board's discussion on this issue. (*See* dkt.
     no. 36-4, Exh. 8.) The Court has not reviewed a transcript of these proceeds. It is not
27   clear that a written transcript exists. (*See* dkt. no. 36-2, Exh. 2, at 40 (Plaintiff's
     deposition testimony that an audio recording of a Board meeting is more accurate than
28   the minutes).)

1   market share, vulnerability, or liability before terminating Plaintiff. Just like the employer

2   in *Anthoine*, Defendants ignored these concerns during Plaintiff's years-long tenure as

3   HGH's sole surgeon. *See Anthoine*, 605 F.3d at 751-52. Plaintiff has offered sufficient

4   facts to create a genuine issue of fact as to whether retaliation was a substantial or

5   motivating factor behind Plaintiff's termination. Accordingly, the Court finds that an issue

6   of fact exists as to this factor.

7

8   **d.      HGH's Justification for Treating Plaintiff Differently and for Terminating the Employment Agreement**

9           Because the Court finds that genuine issues of material fact exist as to the first

10  three factors, the Court now addresses whether Defendants have met their burden for

11  the final two factors: (1) that Defendants had an "adequate justification for treating

12  [Plaintiff] differently from any other member of the general public," *Eng*, 552 F.3d at 1071

13  (quoting *Garcetti*, 547 U.S. at 418) (internal quotation marks omitted); and (2) that the

14  Agreement would have been terminated even in the absence of Plaintiff's protected

15  speech, *id.* at 1072. For both factors, "when questions of motive predominate in the

16  inquiry about how big a role the protected behavior played in the decision, summary

17  judgment will usually not be appropriate." *Ellins*, 710 F.3d at 1064 (quoting *Mabey v.*

18  *Reagan*, 537 F.2d 1036, 1045 (9th Cir. 1976)) (internal quotation marks omitted).

19          To determine whether Defendants were adequately justified in treating Plaintiff

20  differently than a member of the public, the Court must balance Defendants' "interest as

21  an employer in a smoothly-running office" with Plaintiff's First Amendment rights.

22  *Anthoine*, 605 F.3d at 752 (quoting *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009))

23  (internal quotation marks omitted). Defendants "must demonstrate actual, material and

24  substantial disruption, or reasonable predictions of disruption in the workplace." *Id.*

25  (quoting *Robinson*, 566 F.3d at 824) (internal quotation marks omitted). Defendants do

26  not attempt to make such a showing; instead, they argue that Plaintiff does not appear to

27  have alleged that she was treated differently. (*See* dkt. no. 36 at 19.) Defendants have

28  not met their burden on this factor.

Nor have Defendants satisfied their burden as to the last factor, which requires showing that "the employee's protected speech was not a but-for cause of the adverse employment action." *Eng*, 552 F.3d at 1072. This inquiry "relates to, but is distinct from," the third factor, or whether Plaintiff's protected speech was a substantial or motivating factor behind her termination. *Id.* Rather, this factor "asks whether the adverse employment action was based on protected *and* unprotected activities, and if the state would have taken the adverse action if the proper reason alone had existed." *Id.* (quoting *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996)) (internal quotation marks omitted). Defendants contend that Plaintiff's Employment Agreement would have been terminated absent her speech because "the hospital needed additional surgical coverage and decided to contract with a surgical group to provide that coverage." (Dkt. no. 36 at 19.) Defendants also emphasize that Plaintiff testified that the Board rarely reviewed the Medical Staff Issues spreadsheet, and that she believed her termination was due to her decision to seek reelection. (*Id.* (citing dkt. no. 36-2, Ex. 2, at 25, 37).) Taken together, and read in the light most favorable to Plaintiff, this evidence demonstrates that it is not clear that Plaintiff would have been terminated absent her protected speech. Indeed, multiple motives could have prompted Plaintiff's termination — Defendants could have terminated the Employment Agreement because of Plaintiff's complaints or her decision to run for reelection, in addition to Defendants' purported concerns about Plaintiff's ability to serve a sufficiently large share of the area's surgery market. *See Ellins*, 710 F.3d at 1064 (noting that summary judgment is usually not appropriate where "questions of motive predominate" in determining the extent to which protected activity prompted an adverse employment action). Thus, Defendants have failed to meet their burden to show that Plaintiff's protected speech was not a but-for cause of her termination.

Reading the evidence in the light most favorable to Plaintiff, the Court finds that genuine issues of material fact exist for each factor required to determine whether Defendants retaliated against Plaintiff's speech involving a matter of public concern

1    when they terminated her Employment Agreement. Accordingly, Defendants have not
2    shown that they are entitled to summary judgment on this issue.

3              **2.    Individual Defendants' Involvement in the Deprivation**

4              In addition to their merits-based claims, Defendants assert that the FAC fails to
5    identify any specific constitutional deprivation that Individual Defendants caused. (Dkt.
6    no. 36 at 20-21.) This argument is not persuasive. "[T]o establish individual liability under
7    42 U.S.C. § 1983, 'a plaintiff must plead that each Government-official defendant,
8    through the official's own individual actions, has violated the Constitution.'" *Hydrick v.*
9    *Hunter*, 669 F.3d 937, 942 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676
10   (2009)). In *Hydrick* — which Defendants cite in their Motion — the Ninth Circuit rejected
11   a complaint based on "conclusory allegations and generalities" of government officials'
12   conduct, noting that the plaintiffs had failed to identify a specific policy, custom, or event
13   that led to their alleged constitutional deprivations. *Id.* at 942. Here, conversely, the FAC
14   asserts that Individual Defendants were involved in the specific decision to terminate
15   Plaintiff's Employment Agreement. (Dkt. no. 3 ¶¶ 3, 5, 12.) Defendants do not offer any
16   other authority to support their argument that Individual Defendants cannot be liable for
17   their involvement in the decision to terminate Plaintiff's Employment Agreement. (*See*
18   dkt. no. 36 at 20-22.) The Court will not grant summary judgment on this basis.

19             **3.    Qualified Immunity**

20             Finally, Individual Defendants contend that they are entitled to qualified immunity,
21   an affirmative defense that shields from liability government officials whose "conduct
22   does not violate clearly established statutory or constitutional rights of which a
23   reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
24   This immunity is granted broadly and "provides ample protection to all but the plainly
25   incompetent or those who knowingly violate the law." *Moran v. Washington*, 147 F.3d
26   839, 844 (9th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal
27   quotation marks omitted). When conducting the qualified immunity analysis, the court
28   asks "(1) whether the official violated a constitutional right and (2) whether the

constitutional right was clearly established." *C.B. v. City of Sonora*, 769 F.3d 1005, 1022 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)). The court may analyze the elements of the test in whatever order is appropriate under the circumstances of the case. *Pearson*, 555 U.S.at 236, 240-42.  Moreover, courts are to decide whether defendants are entitled to qualified immunity as a matter of law, unless material facts regarding the defense are genuinely disputed. *Conner v. Heiman*, 672 F.3d 1126, 1131 (9th Cir. 2012).

Because the Court has determined that issues of fact exist regarding whether Defendants retaliated against Plaintiff's speech on a matter of public concern in violation of the First Amendment, the remaining question is whether the right was clearly established at the time of the violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 236.  This question is an objective inquiry, and it turns on whether a reasonable official in the defendant's position should have known at the time that his conduct was constitutionally infirm. *Anderson v. Creighton,* 483 U.S. 635, 639-40, (1987); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012). "A [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* ⸺ U.S. – ⸺, 131 S. Ct. 2074, 2083 (2011) (alterations, citation, and internal quotation marks omitted). "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Dunn v. Castro,* 621 F.3d 1196, 1201 (9th Cir. 2010) (citation and internal quotation marks omitted). Courts, however, "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083. Only where a state official's belief as to the constitutionality of his conduct is "plainly incompetent" is qualified immunity unavailable. *Stanton v. Sims*, 571 U.S. ⸺, 134 S. Ct. 3, 5 (2013) (per curiam).

///

1    The right for a hospital employee to engage in speech that "highlights

2    inappropriate standards affecting patient care at a public hospital" is well established.

3    *Ulrich*, 308 F.3d at 978-79 (citations omitted); accord *Pena v. Meeker*, No. C 00-4009

4    CW, 2014 WL 4684800, at *5-6 (N.D. Cal. Sept. 18, 2014) (citing *Ulrich* in holding that

5    qualified immunity did not extend to a hospital's medical director because the plaintiff

6    physician's "right to document patient abuse and malpractice at a public hospital" was

7    clearly established). Here, Plaintiff has demonstrated that the complaints she submitted

8    to the Medical Staff Issues spreadsheet — and other complaints that were never

9    recorded in the spreadsheet — reflect hospital standards and practices that affect

10   patient care. (*See* dkt. no. 36-3, Exh. 3; dkt. no. 36-2, Exh. 2, at 35.) Thus, Individual

11   Defendants are not entitled to qualified immunity for Plaintiff's claim that she was

12   terminated for speaking on a matter of public concern.

13        **B.    Municipal Liability**

14        Because the Court concludes that Plaintiff's claim that she was terminated for

15   speaking on matters of public concern involves genuine issues of material fact, the Court

16   must determine whether liability for this constitutional deprivation may extend to HGH, a

17   municipal entity. "Congress did not intend municipalities to be held liable unless action

18   pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*

19   *v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Under *Monell*, HGH

20   may be liable if its policy, practice, or custom was a moving force behind the First

21   Amendment violations at issue here. *Dougherty*, 654 F.3d at 900. "In order to establish

22   liability for governmental entities under *Monell*, a plaintiff must prove '(1) that the plaintiff

23   possessed a constitutional right of which she was deprived; (2) that the municipality had

24   a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's

25   constitutional right; and, (4) that the policy is the moving force behind the constitutional

26   ///

27   ///

28   ///

violation.'" *Id.* (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir.1997)) (alterations omitted).[8]

Municipal liability may, however, extend to isolated constitutional violations caused by a person with final policymaking authority. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("We [the Court] have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."). In fact, in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986), "the Supreme Court held that a single decision by a municipal policymaker may be sufficient to trigger section 1983 liability under *Monell*, even though the decision is not intended to govern future situations." *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992) (citing *Pembaur*, 475 U.S. at 480-81). Under this rubric, "[m]unicipal liability under section 1983 attaches only where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Gillette*, 979 F.2d at 1347 (quoting *Pembaur*, 475 U.S. at 483-84) (internal quotation marks omitted).

To determine whether municipal liability extends to HGH, the Court must decide (1) whether Individual Defendants are officials with final policymaking authority with respect to employment decisions, and (2) whether those officials made a deliberate choice — or chose to ratify a subordinate's decision — to terminate Plaintiff's Employment Agreement. "[W]hether an official had final policymaking authority is a

///

---

[8]In the FAC, Plaintiff asserts that HGH "has a custom of infringing upon [the] First Amendment rights of its employees." (Dkt. no. 3 ¶ 3.) Plaintiff has not offered evidence of such a custom. Rather, the FAC suggests that Individual Defendants are final policymakers whose decisions would open HGH to liability. (*Id.*) Moreover, Plaintiff relies on the final policymaker theory in her opposition brief, writing that "the Board defendants voted to terminate, an act of the final policymaker for the County as to hospital personnel matter[s]." (Dkt. no. 42 at 9.) The Court accordingly focuses on whether the Board's decision may give rise to municipal liability.

question of state law." *Pembaur*, 475 U.S. at 483. Neither party, however, has addressed whether Individual Defendants constitute officials responsible for establishing policies with regard to surgeon employment and termination. Instead, Defendants insist that Plaintiff cannot show that her First Amendment rights were violated by the Political Participation provision or any other HGH custom. (*See* dkt. no. 36 at 20.) Defendants also rely on their assertion that Plaintiff has failed to establish any deprivation of her constitutional rights (*see id.*; dkt. no. 45 at 18-19), and claim that Plaintiff's arguments regarding the Board's policymaking authority are conclusory (dkt. no. 45 at 18-19). Defendants have not demonstrated that Plaintiff lacks evidence to show that Individual Defendants are officials with final policymaking authority. Nor have they presented evidence to this effect. Accordingly, Defendants have not met their burden in showing the absence of a genuine issue of material fact as to the Board's and Parrish's policymaking authority. *See Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102.

The Court finds that genuine issues of material fact exist as to Plaintiff's claim that she was terminated in retaliation for speaking on matters of public concern. The Court further finds that both Individual Defendants and HGH may be liable for this constitutional deprivation. The Court therefore denies Defendants' Motion in part.

## V.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the Motion's outcome.

It is ordered that Defendants' Motion for Summary Judgment (dkt. no. 36) is denied with regard to Plaintiff's claim that she was terminated because she spoke on a matter of public concern.

It is further ordered that both parties are to prepare supplemental briefing on Plaintiff's claim that Defendants violated her First Amendment rights by restricting her ability to seek reelection to the Board, both through the Political Participation provision

and by terminating Plaintiff's Employment Agreement. The supplemental briefing should address the following questions:

(1)     Is the constitutionality of the Political Participation provision dispositive of this claim?

(2)     If so, is the Political Participation provision a constitutional restriction on Plaintiff's First Amendment rights?

Supplemental briefs are due within fifteen (15) days.  The Court will set a hearing on this issue.

DATED THIS 25th day of March 2015.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE